IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 4, 2025

## IN RE HARPER A., ET AL.

**Appeal from the Chancery Court for Sullivan County**
No. 24-CK-44554   Steven Curtis Rose, Judge

_____

### No. E2025-00869-COA-R3-PT

_____

This appeal involves a petition to terminate the parental rights of a mother to her two children. The juvenile court found that four grounds for termination were proven by clear and convincing evidence and that termination was in the best interests of the children. The mother appeals. We affirm in part and vacate in part. We remand for entry of an order containing findings of fact and conclusions of law regarding the ground of failure to manifest an ability and willingness to care for the children and the factors concerning the best interests of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Jared A. Williams, Kingsport, Tennessee, for the appellant, Whitney A.

Jonathan Skrmetti, Attorney General and Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION[1]

### I.   FACTS & PROCEDURAL HISTORY

This appeal involves the termination of the parental rights of Whitney A. ("Mother") to her two children. The children, Caylem A. and Harper A., were born in 2009 and 2014. Notably, Caylem has type 1 diabetes that requires him to use an insulin pump, as well as

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' last names to protect their identities.

ADHD. The children have different fathers. Caylem's father is unknown. Harper's father has been incarcerated since 2021. His parental rights to Harper were terminated during the trial court proceedings, but he did not appeal that ruling and is therefore not a party to this appeal.

On September 9, 2022, the Department of Children's Services ("DCS") received a "report of harm" alleging that Mother had engaged in environmental neglect of the children. Friends and family had reported that Mother and the children were homeless. They also reported that Mother was unemployed and had no means of transportation. DCS later filed a dependency and neglect petition against Mother on December 1, 2022. The petition stated that a DCS employee had contacted Mother and met with the children at school after DCS received the report of harm. The children informed the DCS worker that the family was "staying at a friend's house." The family later started working with the "Family Promise" program and began staying at a motel. The petition stated that, on November 30, 2022, a DCS worker met with the family at the motel. The children reported having not eaten for more than one day. The DCS worker noticed that Mother "appeared to be under the influence of a substance." Mother consented to a drug screen and tested positive for methamphetamine, amphetamine, and cocaine.

The Sullivan County Juvenile Court entered a protective custody order removing the children from Mother's custody the same day the dependency and neglect petition was filed. Caylem was placed in a "Camelot" foster home in Sneedville, Tennessee. Harper was placed with the family of a school friend. The juvenile court adjudicated the children dependent and neglected on April 6, 2023. During this time, Mother underwent regular drug screening. She tested positive for cocaine, methamphetamine, and/or amphetamine nine times between the filing of the dependency and neglect petition and the subsequent adjudication. Meanwhile, a permanency plan was ratified on March 10, 2023, that stated Mother was to: (1) abstain from drug use, (2) submit to random drug screens, (3) obtain and maintain a safe and suitable home, (4) obtain and maintain a legal source of income, (5) pay child support in the amount of $20 per child per month, (6) attend a mental health intake appointment and comply with all recommendations, (7) visit the children, and (8) work with DCS and the children's caregivers to establish and follow medical and educational plans to ensure their individual needs were met. Shortly thereafter, a second permanency plan was adopted that maintained these goals and added a goal for Mother to form a safe transportation plan by either personal vehicle or public transit.

Mother continued to submit to regular drug screens. She tested positive for cocaine on April 20, 2023, but passed several ensuing drug screens. She also participated in various substance abuse programs. She completed a partial hospitalization substance abuse program through an entity called Journey-Pure on June 2, 2023. She then completed an intensive outpatient program through Journey-Pure on August 8, 2023. She passed seven drug screens between June 11, 2023, and August 2, 2023. Unfortunately, Mother again tested positive for drugs on October 11, 2023. She would ultimately test positive for drugs

twenty-two more times. Nevertheless, Mother searched for a job, maintained contact with DCS, and was offered "Homemaker Services" as well as housing assistance. Unfortunately, Mother was unemployed during the majority of the time. Mother had formerly been employed as a registered nurse. However, in November 2022, co-workers had noticed her acting strangely and later discovered her "asleep in a chair, surrounded by blister packs of pills scattered on the floor, some of which had been opened." She submitted to an oral drug screen and tested positive for cocaine and methamphetamine. Mother later went before the Tennessee Board of Nursing and signed a consent order in which she stipulated that grounds for discipline existed. As a result, her license was suspended subject to an evaluation and recommendation from Tennessee Professional Assistance Program ("TNPAP") that she should be permitted to return to work. Afterward, Mother struggled to obtain employment for more than a short time. Mother did not pay child support consistently throughout the time the children were in foster care. She often missed payments or made partial payments during the first year but stopped making voluntary payments altogether in February 2024.

DCS filed a petition to terminate Mother's parental rights in the Sullivan County Chancery Court on October 1, 2024. DCS raised the following grounds for termination against Mother: (1) abandonment by failure to support, (2) abandonment by failure to provide a suitable home, (3) substantial noncompliance with the permanency plan, (4) persistent conditions, and (5) failure to manifest an ability and willingness to assume custody of or financial responsibility for the children. During this time, Mother did test negative for drugs on occasion and, at one point, was able to pass drugs screens for a period of approximately five weeks during December 2024 and January 2025. However, she again tested positive for drugs on February 10, 2025. Her most recent positive test came on April 25, 2025, approximately ten days before the May 5 termination trial.

The parties proceeded to trial on May 5, 2025. Both children remained in the homes in which they had been placed immediately after the filing of the dependency and neglect petition.[2]

Mother was the first witness called to testify. Mother began by discussing her living arrangements at the time of trial. She stated, "I rent a room at one of my acquaintances' house, him and his mother's house, in Kingsport, Tennessee." She stated that she paid $300 per month for this room, but she did not have a formal lease agreement in place. Mother later stated that she did not "always get treated correctly" by this acquaintance.

---

[2] In July 2024, Caylem was transferred from his foster home and placed with Mother's sister. However, in November 2024, Mother's sister contacted DCS and stated that Caylem needed a new placement. The pair had argued after he spilled water in his room. A DCS worker collected Caylem from school to transport him to a parent/child visit. During this car ride, Caylem reported that his aunt had been verbally abusive toward him. Caylem and the worker later returned to the aunt's home to try and "salvage" the placement, but the conversation quickly resulted in the aunt becoming angry and yelling at both Caylem and the worker. As a result, Caylem returned to his original foster placement.

She stated that there was "abuse sometimes." She clarified that the acquaintance would abuse her "[w]hen he [got] drunk sometimes." She later explained that she and this "acquaintance" had known each other for some time and had been romantically involved for a period of time during the preceding year. She also noted that she had used drugs in this home "[l]ike a year" prior to the trial. She claimed that she planned to leave the home soon. Her plan was to enroll in an in-patient substance abuse program. She claimed that she had wanted to enter the program for some time but had not done so due to financial barriers. However, she had recently been informed that she had "someone willing to scholarship [her]" through the program.

She remained unemployed but claimed that she was seeking employment. She explained that, in the interim, she was "clean[ing] around the house" and working odd jobs. She stated that she had also delivered food via Doordash on occasion. However, she stated she had not done this for some time because her car had been "messed up" since February of that year. Mother also noted that she had previously worked as a nurse and recounted the incident leading to the suspension of her license. She explained that she had worked with the TNPAP in an attempt to regain her nursing license, but she had "voluntarily stopped." She stated that she stopped because "it was a lot" to balance along with her attempts to regain custody of the children. She also stated that the financial commitment required to participate in the program and the fact that she had been living in her car at the time contributed to her decision to stop participating. Mother stated that she had attempted to obtain various non-nursing positions, submitted a litany of applications, undergone several interviews, and even begun working at a few places. She claimed that any time she had started a job, the employer would subsequently learn of criminal convictions for forgery and identity theft she had incurred, at which point, she would be informed she could not work at the establishment.[3] Mother had also been informed that she was overqualified to work at various places due to her nursing background.

Mother was also asked about her history of substance abuse. She admitted to using drugs at various times throughout the proceedings. She acknowledged that her last use occurred on April 20, 2025, which triggered the positive test on April 25, 2025. However, she claimed that this use was not "from partying" but stemmed from "a stressful time" related to her "living situation." Mother acknowledged that her children were initially removed from her custody, in part, due to the drug screen she failed when DCS became involved with the case. She claimed that she had never knowingly used methamphetamine but was "well aware that there [was] a possibility that [it] [was] in whatever [she was] using." She noted that she had been prescribed Adderall at one time.[4]

_____

[3] Mother indicated that she had been convicted of these offenses more than 20 years before the trial took place.

[4] Proof of this prescription was submitted to DCS. As a result, several of Mother's drug screens in which she tested positive only for amphetamines note in the appropriate field that she was on prescribed medication.

- 4 -

Mother also discussed her participation in DCS services. She stated that she had completed a drug and alcohol assessment and a mental health assessment. She was asked whether she had received any recommendations stemming from the drug and alcohol assessment. She responded "[n]ot that I'm aware of that there were any from that specific one." However, she noted that her mental health assessment required her to meet with a therapist. She had since begun meeting with a psychiatrist. She noted that she had completed a substance abuse program while living in Knoxville in the fall of 2023. Mother also acknowledged that she had fallen behind on child support. She acknowledged that she had not paid the required amount of support but claimed to have brought food and other items to visitations. She also stated that she had a child support payment "garnished on [her] taxes.[5] Mother also noted that she had placed her name "on the housing list" and her name had "moved up quite a bit" on this list.

Mother also described her visits with the children. She visits both children individually once per month and does a group visit with both children once per month. She claimed that she and Harper had "great visits" in which they did many activities and discussed Harper's school, extracurriculars, and personal life. She stated that her visits with Caylem were "okay" and had improved significantly since he began attending therapy.

Mother was asked to explain how her circumstances had changed since the children had been removed from her custody. She stated that "despite the abuse" her living situation was "a little bit more stable" because she had a place she could sleep, access to running water, a refrigerator, kitchen, and other amenities. She also claimed that this would help her maintain employment when she obtained a job. However, she admitted that she "would not put [her] kids there." Mother again stated that she had recently received a "scholarship" to attend a substance abuse program and intended to go through the process of regaining her nursing license. She claimed that within the next four months she would have suitable housing, a job, and transportation. She also claimed that she would pay child support. She recommended that her children remain in their foster homes during that time. Mother also claimed that she had "good bonded relationships" with both children. She opined that it would be unfair to remove the children from their foster homes but claimed it would also be unfair to terminate her parental rights because she was "all they've ever known." She acknowledged that Harper was bonded with her foster family and was "flourishing" in her placement and stated she did not want her "torn away" from her foster family. However, she did not want her "torn away" from her biological family either. She admitted that she had not completed several of the items listed on her permanency plans, although she claimed she could do so within four months. She stated that she had not done so up to that point due to a lack of support or "a way to fund" her plan. She later stated that her rights should not be terminated because she had taken several positive steps toward regaining custody of the children, such as registering for a housing list, searching for jobs, visiting

_____

[5] The record reflects that Mother made an involuntary child support payment in March 2025.

- 5 -

the children consistently, and remaining active in the children's lives. She claimed that the family had become very "close" and "if anything, [had] become a stronger family unit because" of the situation.

Stephanie Lowe also testified. Ms. Lowe worked as the DCS case manager for the children until approximately two months prior to the trial. She recounted the events leading to the removal of the children. She then discussed Mother's child support obligations and stated that Mother had not paid any child support for the four months preceding the filing of the petition to terminate her parental rights. She had provided some meals and items at Christmas, but it had "not been very much."

Ms. Lowe also discussed the efforts that DCS made to help Mother establish a suitable home during the four months following the removal of the children from Mother's custody. She stated that she offered Mother "Homemaker Services," which are designed to help families procure housing and aid in several other tasks such as budgeting, cleaning, and procuring employment. Mother initially declined this offer but later accepted. She stated that Mother participated in Homemaker Services three times, applied for income-based housing, and asked for a letter to submit to housing agencies. Mother made no other efforts during those four months. She indicated that, at the time of trial, Mother still lacked a suitable home and noted it was unlikely that Mother would be able to provide a suitable home within the next four months.

Next, she discussed the permanency plans developed throughout the case and the responsibilities for Mother outlined in those plans. She explained that while Mother had completed some of those steps, there were many she had not completed. Mother had not obtained a safe and suitable home, secured a legal source of income, or implemented a safe transportation plan. Ms. Lowe also noted that, contrary to Mother's testimony, as a result of the alcohol and drug assessment, Mother had been recommended outpatient therapy and to "follow up with Tennessee Health Link, which is case management services." She claimed that Mother had not completed either of these recommendations. She also noted that Mother had tested positive for drugs many times throughout the proceedings and had tested positive more often than she had tested negative. She also noted that there were "concerns" that the people Mother lived with were using drugs. She opined that this posed a threat of future neglect and abuse of the children. Ms. Lowe stated that the children were doing well. She noted that Harper had been experiencing some anxiety issues and had a history of similar issues such as sleepwalking. She had recently been prescribed antidepressant medication. She stated that "a lot of [those issues] ha[d] stemmed from visitations" with Mother. Caylem was doing well. She noted that Caylem's foster home was very adept at managing his diabetes. She reported that Caylem did not have any behavioral issues and was doing "pretty good" in school.

Next, Brittany Pope was called to testify. Ms. Pope works for DCS as a case manager and became the children's case manager after Ms. Lowe. She began by discussing

the children's foster homes. She explained that the children were in separate homes because of Caylem's "intense diabetes needs." She stated that "it takes a special person to care for" Caylem's needs and the foster home he was placed in was equipped do so. He liked the home and told Ms. Pope he was "okay with being adopted or staying [in the foster home] either one." Two other teenage boys lived in the home, and they had become Caylem's friends. Caylem had just turned 16. His foster home was not pre-adoptive, but the foster parent had agreed to keep him until he turned 18. Harper was "doing okay." She had recently "broke[n] down" during a conversation with a doctor and was prescribed antidepressant psychotropic medication. Harper had informed Ms. Pope that she wished to be adopted by her foster family. The foster parents are pre-adoptive. Ms. Pope testified that she believed a change in caregivers would have a negative effect on both children. She identified Harper's attachment to her foster family and Caylem's support with his diabetes as disruptions that could occur if they were removed from their present placements. She stated that both children had created healthy parental attachments with their foster parents. Conversely, she opined that Mother had not demonstrated the stability necessary to meet the children's needs.

Ms. Pope also noted that Harper had informed her she was "fearful" of returning to Mother's custody. Harper had also stated that Mother had "camped out around her foster home, showed up to her dance studio and dance recitals, trying to get her to go with her." She stated that Harper gets "really anxious before and after the visits." Harper had passed out at school, developed very red eyes, and been unable to sleep. Conversely, she had been fully integrated into her foster family and was treated no differently than the foster parents' biological children. Meanwhile, Caylem had a history of behavioral issues that necessitated a structured environment. These issues had improved as Caylem aged. She explained that Caylem's behaviors "were trauma based." Ms. Pope testified that anticipation of visits with Mother had generated behaviors and the visits themselves had often involved him and Mother arguing. Conversely, his foster parents were "really good at working with him."

Harper's foster mother ("Foster Mother") was the final witness to testify. Foster Mother stated that the family consists of herself, her husband ("Foster Father"), Harper, and their two biological sons, who are ages 11 and 8. Foster Mother stated that Harper was "doing great as far as daily activities [and] school." She was also enrolled in dance classes and had been in a production of the Nutcracker twice. The family met Harper prior to the initiation of these proceedings, as she was in the same grade as one of the family's biological sons and the two had become friends. When Harper was removed from Mother's custody, she was asked if there was anywhere she could stay. Harper told DCS about Foster Mother's family. DCS contacted Foster Mother, and she agreed to the placement. Harper arrived at the home that evening and had remained there ever since. Foster Mother recalled that when Harper was removed from Mother's custody, her hair was a "tangled mess" and DCS believed it would have to be cut. However, Foster Mother and her neighbor were able to "slowly work it through." They spent approximately seven hours doing so

and were able to repair Harper's hair without cutting it. She stated that Harper has "a lot of anxiety" and usually "is really afraid to try new things." However, she recounted another story in which the family went to the lake and Harper learned to tube and surf. She stated that Harper is very closely bonded with the family's younger son as well. Harper is also close with members of Foster Mother's extended family. She stated that she and Foster Father had completed foster parent training and were "official." She also stated that she and Foster Father intended to adopt Harper if Mother's parental rights were terminated.

Additionally, Foster Mother testified regarding Mother's behavior. She stated that Mother had appeared unexpectedly after one of Harper's dance performances. Mother had also appeared unexpectedly at the family's car as they went to leave a Christmas parade. Harper had also informed her that "she thought she saw her mom drive by" their home on previous occasions. On one occasion, Harper informed her that she had observed Mother's car parked in a parking lot near the home. Foster Mother stated that she went outside and saw a car similar to the car Mother was driving at the time in that parking lot. She also stated that Harper becomes very anxious when visits with Mother approach. She stated that Harper bites and picks her nails until they bleed, bites her lips until they bleed, and rubs her eyes until they bleed. She stated that DCS has always told her that the visits went well, but Harper is often upset when she returns home and has on occasion "just cried and begged me not to ever make her go back" and asked, "why can't we just adopt her?" She stated, "some of those visits have been hard." This concluded the trial.

The trial court entered its final order on May 13, 2025. The trial court found that the ground of abandonment by failure to support had not been proven against Mother because DCS had not shown that Mother's failure to support the children was willful.[6] However, the trial court did find that the following grounds for the termination of Mother's parental rights had been proven by clear and convincing evidence: (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with a permanency plan, (3) persistent conditions, and (4) failure to manifest an ability and willingness to assume custody or financial responsibility for the children. The trial court also found that the termination of Mother's parental rights was in the children's best interests. Mother filed this appeal.[7]

## II.    ISSUES PRESENTED

Mother presents the following issue for review on appeal, which we have slightly reframed:

---

[6] DCS does not appeal this finding.
[7] The trial court also determined that several grounds for the termination of Father's parental rights to Harper had been proven by clear and convincing evidence. The trial court further found that termination was in Harper's best interest. Notably, Father stated at trial that he wished to surrender his parental rights to Harper. However, a written surrender form is not contained in the record. Father has not appealed the termination of his parental rights.

1. Whether the juvenile court erred when it determined that termination was in the best interests of the children.

While Mother has not raised any issue pertaining to the trial court's decision that grounds for termination existed, we will nonetheless review the juvenile court's findings as to each ground for termination pursuant to our Supreme Court's directive in *In re Carrington H*. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.") For the following reasons, we affirm the trial court's determination as to three grounds for termination. However, due to insufficient findings of fact, we must vacate the trial court's ruling as to one ground for termination and its determination that termination was in the best interests of the children.

### III.    STANDARDS APPLICABLE TO TERMINATION CASES

"'A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 521). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the child's best interest pursuant to the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn.Ct.App.2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285

S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

We review a court's factual findings *de novo* in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 523-24. However, "[w]hen a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary." *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). We make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness," as are any additional questions of law. *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

## A. Grounds for Termination

We first address the ground of failure to manifest an ability and willingness to assume custody of or financial responsibility for the children. The trial court found that this ground for termination was proven by clear and convincing evidence. This ground exists where a parent:

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). To prove this ground, the petitioner must prove two "prongs" by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d at 674. The first prong is that "the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[.]" *Id.* This is satisfied by "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness[.]" *Id.* at 677. "A parent's ability to assume custody or financial responsibility is evaluated based 'on the parent's lifestyle and circumstances.'" *In re Trenton B.*, No. M2022-00422-COA-R3-PT, 2023 WL 569385, at *6 (Tenn. Ct. App. Jan. 27, 2023) (quoting *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614 at *5 (Tenn. Ct. App. Apr. 9, 2020)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at

- 10 -

*5 (Tenn. Ct. App. Oct. 26, 2018). The second prong requires proof that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

The trial court's findings on this ground as to Mother are sparse. The order provides:

> [Mother] testified she shares a deep love and want and desire to care for her children; however, the facts remain, based upon her testimony and the record as a whole, that she has been unable to manifest an ability to assume legal and physical custody and has also failed to demonstrate an ability to provide financial responsibility for Harper . . . and Caylem . . . .

> The Court finds, by clear and convincing evidence, that placing the children in the legal and physical custody of [Mother] and [Father] would pose a risk of substantial harm to the physical and psychological welfare of the children. Therefore, DCS has proven, by clear and convincing evidence, the grounds related to the failure to assume custody or financial responsibility.

Unfortunately, these statements do not contain findings of fact that explain what led the trial court to form its conclusion that this ground was proven by clear and convincing evidence. Rather, these statements are merely conclusions of law. *See In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *4 (Tenn. Ct. App. Dec. 23, 2003) (stating that "a recitation in a final order that a parent has 'abandoned the child' is a conclusion of law, not a finding of fact"). "[M]ere legal conclusions" do not "fulfill the trial court's obligations [and] are [not] sufficient to satisfy the directive of Tennessee Code Annotated Section 36-1-113(k)." *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016). "Instead, the court's order 'must set forth the findings of fact that underlie the conclusions of law.'" *In re Skylar M.*, No. E2022-00119-COA-R3-PT, 2022 WL 3099267, at *5 (Tenn. Ct. App. Aug. 4, 2022) (quoting *In re Adoption of T.L.H.*, No. M2008-01408-COA-R3-PT, 2009 WL 152475, at *5 (Tenn. Ct. App. Jan. 21, 2009)). Failure to enter an order compliant "with subsection (k) 'fatally undermines the validity of a termination order.'" *In re Navada N.*, 498 S.W.3d at 594 (quoting *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004)). Here, the trial court has not explained what facts led it to determine that Mother failed to manifest an ability and willingness to assume custody of, or financial responsibility for, the children. Likewise, the order does not explain what factual findings demonstrate that the children would be at risk of suffering substantial harm if placed back in Mother's custody. "It is not the role of this Court . . . to make factual findings where the trial court fails to do so." *Id.* at 594. Therefore, we must vacate the portion of the trial court's order related to this ground for termination. We remand this issue to the trial court for entry of an order containing the necessary findings of fact.

Next, we address whether the trial court erred when it found that DCS proved the statutory ground of persistent conditions by clear and convincing evidence. The ground of

- 11 -

persistent conditions exists where:

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be dependent and neglected child, and:
>
>> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>>
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>>
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. This Court has explained that "[t]he necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)).

The purpose behind the ground of persistent conditions "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). Importantly, rather than focusing on the parent's efforts to remedy the conditions preventing reunification, "the ground of persistent conditions focuses on whether the parent's efforts have been fruitful, i.e., whether the parent has remedied the conditions that led to the child's removal or whether those conditions 'will be remedied at an early date . . . in the near future.'" *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *20 (Tenn. Ct. App. Sept. 14, 2012) (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii)). "This ground for termination focuses on the *results* of the parent's efforts at improvement rather than the mere fact that he or she has made them." *In re*

*Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020) (citing *In re Abigail F.K.*, 2012 WL 4038526, at *20). Here, the trial court found that the conditions leading to removal had "persisted . . . since the removal of [the] children . . . and continue[d] to persist as of May 5, 2025." The trial court explained that the conditions leading to the removal of the children persisted because Mother continued to test positive for drugs, and had not obtained a suitable home, stable income, or safe transportation. The trial court noted that the home Mother resided in was not suitable for the children because it was "an environment that [was] abusive and also one in which there [was] alcohol and drugs present." We agree.

The six-month statutory time period has clearly been met in this case. The order removing the children from Mother's custody was entered on December 1, 2022, as a result of the dependency and neglect petition. The termination trial took place on May 5, 2025, more than two years later. Additionally, the conditions leading to removal clearly persisted. The dependency and neglect petition referenced environmental neglect, as the family was homeless and staying in a motel when the children were removed. The petition also noted that Mother lacked transportation, lacked a job, and tested positive for methamphetamine, amphetamine, and cocaine. None of these conditions had been remedied at the time of trial. Mother had recently moved into a bedroom located in a home owned by a former paramour. She noted that the former paramour abuses her "[w]hen he gets drunk sometimes." She also admitted to having used drugs in the home approximately one year before the time of trial. Ms. Lowe also testified that there were "concerns that other people" living in the home also abused drugs. Mother even admitted that she did not have suitable housing at the time of trial. Mother also lacked transportation. While Mother had acquired a car at some point and worked "Doordash" with that car, the car had been "messed up" since February. Mother gave no indication that it would be repaired soon or would be reliable moving forward. Additionally, Mother had not obtained a stable means of income. She stated that she had worked odd jobs at times. She further testified that she had applied and interviewed for several positions. However, Mother had not been hired to or remained in any position long-term. Mother had also not regained her nursing license. Lastly, Mother continued to abuse drugs. Mother tested positive for drugs a litany of times throughout these proceedings. Mother failed a drug screen taken on April 25, 2025, approximately ten days prior to the trial in this matter. Mother has made some attempts to become sober throughout these proceedings. In 2023, she completed two substance abuse programs. She also expressed a desire to participate in another program soon. Unfortunately, these activities did not result in her remaining sober for the extended period of time necessary to remedy the conditions which led to the children being brought into DCS custody. Despite the time that has passed in this case, Mother has made little to no progress toward remedying the conditions which resulted in the children being removed from her custody. Despite her request for four more months to prove that she can remedy these conditions, no evidence was entered demonstrating she could do so.

Additionally, the testimony submitted at trial indicates that Mother's continued

involvement in the children's lives would stand as an obstacle preventing them from entering suitable long-term placements. While Caylem's home is not pre-adoptive, his foster parents have agreed to care for him until he turns 18. Likewise, Caylem's home is adept at caring for his severe diabetes. Further, two other teenage boys live in the home, and the testimony indicates that Caylem and these boys have become friends. Conversely, Mother's presence in Caylem's life leads to arguments and causes him to exhibit poor behaviors when he is normally well-behaved. Meanwhile, Harper has been in Foster Mother's home since she was removed from Mother's custody. She has built strong relationships with Foster Mother and the other members of her foster family. Testimony indicates that Harper is very comfortable and loved in this home, and her foster parents will seek to adopt her if Mother's rights are terminated. Meanwhile, Harper is adversely affected by Mother's presence in her life. She becomes very anxious before and after visits and exhibits behaviors such as biting her nails, biting her lips, and rubbing her eyes. She has also passed out at school. Conversely, she is comfortable with and supported by her foster family. For these reasons, we affirm the trial court's determination that DCS proved the ground of persistent conditions by clear and convincing evidence.

The additional grounds the trial court found for terminating Mother's parental rights include: (1) substantial noncompliance with the permanency plan and (2) abandonment by failure to provide a suitable home. "As instructed by *In re Carrington H.*, we have likewise reviewed the [trial] [c]ourt's findings as to each of these additional grounds as found by the [trial] [c]ourt." *In re Meadow L.*, No. E2024-01425-COA-R3-PT, 2025 WL 1779767, at *13 (Tenn. Ct. App. June 24, 2025), *no perm. app. filed*. As stated above, Mother, by her own admission, still lacks a suitable home. Likewise, Mother is unemployed, lacks a reliable plan for transportation, and has continued to test positive for drugs. The evidence does not preponderate against the trial court's findings relevant to these grounds. Abandonment by failure to provide a suitable home is predicated on Mother's lack of efforts to provide a suitable home, and these facts show she did not make the efforts necessary to establish such a home. Additionally, these facts demonstrate Mother's substantial noncompliance with the permanency plan. Therefore, both "of these additional grounds [were] proven by clear and convincing evidence, and we affirm the [trial] [c]ourt's judgment as to these grounds." *In re Meadow L.*, 2025 WL 1779767, at *13.

### B. Best Interests of the Children

Having determined that the trial court did not err when it found DCS proved three statutory grounds for termination existed, we now turn to whether the termination of Mother's parental rights was in the best interests of the children. When assessing whether termination is in a child's best interest, courts are to consider the non-exhaustive factors contained in Tennessee Code Annotated section 36-1-113(i). Notably, the parental termination statute also requires the trial court to enter "an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). These findings are necessary to "'facilitate appellate review and promote just and speedy resolution of

appeals.'" *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010) (quoting *In re Audrey S.*, 182 S.W.3d at 861). "Without these findings and conclusions, appellate courts are left to wonder on what basis the trial court reached its ultimate decision." *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *11 (Tenn. Ct. App. Nov. 16, 2015). When a trial court fails to comply with the requirements of section 36-1-113(k), "the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law." *Dept. of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 762 (Tenn. Ct. App. 2006) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)).

Here, the trial court concluded that termination of Mother's parental rights was in the best interest of both children. Despite the existence of 20 statutory best interest factors, the trial court made only four findings of fact regarding those factors. Those include:

> The Court finds that both Caylem [ ] and Harper [ ] are thriving in their current foster homes.
>
> The Court finds that Caylem [ ] has a medical condition that requires extensive care, and that care is being provided by his foster family.
>
> The Court further finds that Caylem [ ] has two foster brothers of which he is well situated and well adjusted to and by all accounts enjoys surrounding himself with the stability and relational security that this foster family currently provides to him.
>
> The Court finds that Harper [ ] is thriving in her current environment and loves and considers herself to be a part of the foster family she currently resides with and has resided with since removal from her mother's care. She has a medical condition which is being tended to and well maintained by her foster family. The Court further finds that she is best situated with this foster family for her medical, emotional, physical and other needs such that it is in her best interests to continue to reside with her foster family.

The trial court then listed 15 of the best interest factors contained in Tennessee Code Annotated section 36-1-113(i) and stated that each factor was "applicable" and "weigh[ed] in favor of terminating [Mother's] rights." The trial court has not performed a complete analysis of each factor tying specific factual findings to the individual factors. The trial court does reference the best interest factors, and states that 15 of these factors weighed in favor of termination, however, it does not explain the facts supporting those determinations. While the four factual findings made by the trial court are certainly relevant to several of the various factors, the trial court does not explain which factors.[8]

---

[8] We recognize that, "a trial court is not required to restate the relevant factual findings within the discussion of each and every ground and best interest factor to comply with section 113(k) so long as the

- 15 -

Further, these findings do not pertain to several of the best interest factors that the trial court found weighed in favor of termination. For example, these findings do not consider whether Mother maintained visitation, whether Mother took advantage of available programs or resources in an attempt to adjust to the circumstances leading to the removal of the children, or whether Mother paid more than token child support. *See* Tenn. Code Ann. § 36-1-113(i) (E), (K), and (S). Therefore, "we are constrained to remand the issue" for the trial court to enter an order containing the required factual findings relevant to the children's best interests "for 'we may not conduct a *de novo* review of the termination decision in the absence of such findings.'" *In re Kadean T.*, No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at *11 (Tenn. Ct. App. Oct. 31, 2014) (quoting *In re Angela E.*, 303 S.W.3d at 254).

## V. CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the decision of the trial court. Accordingly, we remand this matter for entry of an order compliant with Tennessee Code Annotated section 36-1-113(k). Costs of this appeal are taxed to the appellant, Whitney A., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

order contains sufficient findings to explain and support the trial court's conclusions, allowing for meaningful review of the trial court's decision." *In re Jaxon N.*, No. E2024-01405-COA-R3-PT, 2025 WL 1250586, at *11 (Tenn. Ct. App. Apr. 30, 2025) (quoting *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *8 (Tenn. Ct. App. Dec. 4, 2023)). Here, the findings are not sufficient throughout the order as a whole to inform us of the trial court's reasoning regarding why the various factors applied, and therefore, does not allow for meaningful review of the trial court's decision.